Our next case is case number 415-0507, the people of the state of Illinois v. David Masterson. For the appellant we have Mr. Kopacz, is that how you pronounce that, sir? Kopacz. Kopacz, okay, and then Mr. Londrigan for the appellee. You may proceed, counsel. Thank you, and may it please the court. My name is Christopher Kopacz and I represent David Masterson. We argued three issues in our brief. Today I'd like to focus my arguments on the first and third issues in the brief, that is regarding the 911 call and the exceptionally brutal or heinous sentencing factor, and then I'll stand on my brief with respect to the second issue, the crime scene video, unless this court has any questions on that. As for the 911 call in issue 1, the 911 call went to the heart of this self-defense case. There's no dispute that David Masterson was the person who struck the fatal blows to Jason Tournier. The only question before the jury was whether Masterson acted in self-defense, whether reasonably or unreasonably, and the answer to that question really turned on the credibility of David Masterson, who was the only person in the apartment who could tell the jury what went on. To that end, the defense sought to introduce, after Masterson testified, the defense sought to introduce the 911 recording made by Masterson and his neighbor, Michael McQuarrie, immediately after the incident. Well, his neighbor made the call, but he's heard... Correct. ...during the call making the statements that he wanted admitted. Correct. So during that call, about two minutes into the call, the 911 dispatcher suggests to them that they try to find a clean towel or cloth and apply it to the wound, to which Masterson responds, he's violent, I'm not getting nowhere near him, and he's a threat. The state objected to these statements coming into evidence, and the trial court sustained the objection, and so this 911 recording did not come into evidence. The trial court erred because it could have come in under one of two alternative theories, either as an excited utterance or as a prior consistent statement. As to an excited utterance, Rule 803 allows for a statement to come in as an excited utterance if it was made after a startling event, if there is an absence of time to fabricate, and if the statement relates to the occurrence. And all three of those elements are met here. There was plainly a startling event. The case law said that a homicide, such as a shooting or stabbing and the like, are startling events sufficient to allow an excited utterance. And here we have direct testimony that Masterson himself was startled. Melinda Raymond, the other neighbor who testified at the trial, testified as to Masterson's demeanor. She said that Masterson was pacing back and forth. He was, quote, frantic, quote, scared, quote, excited. Counsel, what about the language in People v. Sutton, Supreme Court opinion, 233 Illinois 2nd 89, that's cited in People v. Burton, 399 Illinois at 3rd 899, that includes an additional element that would be relevant in a case like this, whether the statement is in the declarant's self-interest. Right, so to some extent that's a factor that could be considered, but it's not dispositive. Because to some extent the excited utterance theory presumes some sort of self-interest. But the theory is that you're giving the statement so quickly after a very startling event that it overcomes any sort of self-interest that you might have. So here... It doesn't necessarily presume a self-interest because statements frequently are by victims, not defendants. Here you have a statement by a defendant. Right, well, the statement, or excuse me, the excited utterance rule doesn't limit it to victims or defendants. It doesn't limit it to any particular declarant. If it meets the elements of an excited utterance, it can come in. So, you know, to some extent, you know, that would sort of swallow the rule if that were the dispositive factor. I'm just asking if it's an additional factor because you don't reference that factor in the brief. It is mentioned in the brief early on in the law section of the excited utterance. But the case law really talks about those three other factors that stem directly from the plain language of Rule 803-2. Those three factors, startling event, time to fabricate, relates to the occurrence. And as to the self-interest here, the statement doesn't really go to any self-interest. He's trying to get medical aid for the victim here. But doesn't it go directly to whether or not he was defending himself or whether he had a reasonable basis to say that he was being threatened and this was self-defense? Yeah, so it supports the self-defense. But it's all, but it's in the context of him trying to get medical aid. Well, but as we know, as he knows, and as we know now, by that time, the victim's already been hit at least 12 times in the head. His brains have been splattered. He's probably well dead by that point. And yet, by the statement of the defendant, he would almost imply that he's concerned about the possibility that this guy might hurt him if he goes back there with a towel, which we know wouldn't be true. Well, I mean, that's not necessarily the case. We weren't there. The point of this statement is that Masterson thought that Tournier was so violent, so threatening, that he wouldn't go near him, even to apply some sort of medical assistance. So, you know, it does support his self-defense case. But, you know, at the time, Masterson's maintained that he was justified in what he did. So any sort of self-interest or trying to, you know, exculpate himself from this just isn't present here. And that's what I don't understand what you're saying. Because it was there. Because he knew he had bludgeoned this guy to death. And so he's already potentially trying to frame this to look like, you know, I'm defending myself, I'm afraid of him. And even though he knew there was no chance that by placing or trying to approach him and place a towel, that he would be in danger. To some extent, again, that's part of the excited utterance. If that were part of the rule, it would be written in the plain language or be seen in the case law that defendants couldn't make an excited utterance. We cited a couple of cases. We're not saying you can't make it. We're saying it doesn't sound good in this case. It goes to the issue of whether or not it was fabricated for his own self-interest. That's what I'm getting at. Right. And so, you know, we cited a couple of cases in the brief, Walston and Nestrock, where defendants tried to get in statements under the excited utterance rule. And the courts didn't have any issue with the fact that it was the defendant making those statements and that the defendant might have some sort of self-interest. The statements were disallowed on other grounds. And to a large extent, the issues that I think you're getting at, you know, ultimately go to the weight of this statement. So, you know, the defendant might have some sort of self-interest in maybe trying to make this look like self-defense. But that's something for the jury to ultimately decide. Well, I mean, how are we looking at this in terms of the trial court's decision? I mean, what's the standard of review? So it would be an abuse of discretion. But here, where it so plainly meets the excited utterance elements, it was an abuse of the trial court's discretion not to allow this. We don't get to the abuse of discretion unless we say that it's plain air. This wasn't preserved. We argued that this was preserved. Was it included in a post-trial motion? It was Issue 1 in the post-trial motion that the 9-1-1 call was erroneously barred from... Based on excited utterance? Based on neither specific theory. What the motion for new trial said is that it went to the defendant's state of mind as to self-defense, which it does. The point is that... Let me ask you this. And at the trial court level, in terms of when you... I don't know if I can recall if you were the attorney at the trial court. Okay. When the attorney at the trial court level was trying to get it in, was it represented to the trial court that it should come in under excited utterance? The prosecution, in its objection, said that it should not come in as either an excited utterance or as a prior consistent statement. But was it offered in that way by defense counsel? Defense offered it... For rebuttal, right? For rebuttal is what she said. So the point is that both issues, excited utterance and prior consistent statement, were fully litigated before the trial court below. The trial court had the opportunity to rule on it and said, based on the arguments of counsel, I'm not going to allow this 9-1-1 recording into evidence. So for purposes of forfeiture, these issues are preserved. But if this court finds they're not, then, of course, we would go to plain error. And we argue that the evidence was closely balanced for purposes of a plain error test. Alternatively, the statement could have come in as a prior consistent statement. The state makes no argument that that was not preserved. So that is a preserved issue. And that statement would come in as a rebuttal of an allegation of recent fabrication. And the prosecution in this case alleged a recent fabrication during Masterson's testimony. And Masterson testified as to a number of things that occur. Basically, the crux of... Did they really argue recent fabrication? I mean, it seems to me that the state was basically arguing that he started to try to paint this picture of him being the victim being violent and the defendant being in danger really from almost the start of the crime. During the cross-examination, the prosecution said a number of things about pulling the belt, pulling him into the chair. These are all things that you now claim happened. The point being that Masterson's not making these poor self-defense claims until the point of trial. Well, was it that he wasn't making self-defense claims prior to that time? Or was it that you're now telling us new details to support your already existing self-defense claim that you started basically from the beginning of the crime? I think the overall point is that the defendant did not give... that those actions were fabricated at the time of trial. So having made that allegation, Masterson was entitled to rebut that allegation with a statement given before that, no, he was saying self-defense from the get-go, that he was saying that Attorney A was violent, he was a threat, so much so that even after the altercation was over, Masterson wouldn't approach him for aid. So one other point with respect to the prior consistent statement that I think is really important, sort of goes to what we talked about earlier. The trial court in the state argued, well, he has this motive to testify falsely. There's some self-interest here. But the case law has made clear that under the allegation of recent fabrication prong, it's not important whether there's a motive to testify falsely. That's a separate exception to the prior consistent statement rule. And so here, what matters is that there's an allegation of recent fabrication, and you have a statement that predates that allegation. And is it not true that a prior consistent statement rebuts the inference of fabrication only if the motive to fabricate is shown not to exist at the time of the prior consistent statement? At least it says that in People v. Jones. Right. I think the court looks at ANSAC or Richardson, other cases that are cited in the brief. I think that some of the language in some other cases I think is a little sloppy. And so ANSAC and Richardson really make the point clear that these are two separate exceptions, and so you look at them separately. If you have an allegation of recent fabrication, all that matters is that the statement predate the recent fabrication. If I'm not mistaken, ANSAC was rejected by a subsequent case, People v. Grissett, 288 Hillett 3rd, 620, citing People v. Williams, 147 Illinois 2nd, 173. Right. And we still have... So ANSAC isn't undisputed. Right. So there's some... We'll acknowledge that there's some dispute on this issue. I think it's more persuasive, ANSAC and Richardson, a First District case, where these are two separate prongs, two separate ways to get in a prior consistent statement. Under the plain language of the rules of evidence, we should treat them separately and distinctly. If this Court has no other questions on the first issue, I suppose I'll turn to the third issue about the exceptionally brutal or heinous sentencing factor. The State was required to prove beyond a reasonable doubt that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. Now, to a large extent, all murders are going to be... can be described as brutal or heinous or cruel. This requires that they be exceptionally brutal or heinous and indicative of wanton cruelty. And so to make sure that this factor is not automatically or reflexively applied to all murders, the Courts have allowed... or have described a number of factors that we have to look at in determining whether a particular case justifies this factor and allows a judge to give an extended term sentence, as happened in this case, of natural life, the highest sentence we have in Illinois. And among those factors, perhaps the most critical is that there was no evidence whatsoever that this was a premeditated or planned crime. It's undisputed that Tournier came to Masterson's home uninvited, intoxicated. Masterson had tried to get him to leave but was unsuccessful in doing so. And the State's own theory below and here in this Court is that Masterson, having been fed up with Tournier, simply lost his temper and became enraged and killed Tournier. So by the State's own theory, this is not a case that's premeditated, that's calculated. I thought you already told the neighbors that if they didn't do something to get this guy out of the house that he was going to really... I won't use his terms, but he was going to do something to him. There was one statement to that effect by Melinda Raymond, the neighbor who testified. She did not give that statement to the police when she was first interviewed. So there's a credibility issue as to that particular statement. And the general point or the overall circumstances of this is not one where Masterson went out and sought out the victim. He didn't break into the victim's home. He wasn't seeking out, lying in wait looking for a particular victim. This was something where Tournier came to his home uninvited and the situation erupted rather quickly. So even if you accept the truth of that statement, this is not a case where someone is premeditated, doing a murder in a premeditated or planned way. This is also not a case that involves any torture or gratuitous violence. It's not a case where the defendant... Gratuitous violence? Correct. It's not a case where the defendant is trying to purposely inflict pain or agony on the victim. It's not like 12 blows to the head is purposeful. Well, they may be purposeful. All basically in the same location apparently. Right. So this is not like other cases we have cited in the brief where the defendant has inflicted injuries all over a victim's body over the course of hours or days. This was very swift. The situation erupted quickly and the blows were all to a single location on the body. Granted, 12 of them were severe enough to bring about the victim's death, but it wasn't the kind of painful or prolonged conduct that would show the exceptionally brutal or heinous circumstances required under this factor. If we believe Sergeant Curran, the defendant said he enjoyed looking into the victim's eyes and watching him die. Right. Well, that would suggest that he wasn't dead after the first two or three blows, that he was actually still in a state of dying when the defendant stopped striking the blows. The death, nonetheless, occurred relatively quickly. This wasn't something that happened over the course of even an hour. I mean, this happened very briefly, at most within a couple of minutes of when McQuarrie had left the apartment previously. So this is not something where it's a prolonged death or an attempt to really inflict pain on the victim. It happened very quickly. They were severe enough to bring about the death, but not gratuitous violence. We'd also point out there was some evidence of provocation here, especially where the court gave self-defense and second-degree murder instructions that connotes by law that there was some evidence to support the idea. A jury instruction. Right. Certainly the jury could reject that. Yeah, and the jury did reject that. Right. But even so, there's some element of provocation here where Masterson's not the initial repressor, where Tornier sort of contributed, in a sense, to the situation that arose. Also, Masterson sought out medical aid for the victim, called 911, even flagged it. He didn't call 911. Asked the neighbor to call 911. Excuse me. So he may not have made the phone call, but he immediately asked for 911 to be called, and then stayed at the scene, flagged on the officer who came to the apartment, and then fully cooperated. So this isn't the sort of crime that's devoid of compassion. Do you think that maybe his own comments that he made to his parents or to his family, talking about the victim in the fashion that he did, might have contributed to that determination as well? If so, it would probably be improper. Overall, what the comments show and what his statements to everyone show is that he believed he was justified in what he did. He thought he was acting in self-defense. Well, he seemed to think that because someone wouldn't leave his home, he had the right to beat them to death. Some of his statements seem to suggest that. But then there's also testimony, his trial testimony, which supports the notion that Tornier was an aggressor, blocked him from leaving his own apartment. Well, it's only by him. Masterson? Yes. Masterson was the only witness to testify to that. Counsel, I'm sorry, you're out of time. You will have time longer, but no problem. Thank you. Mr. Wandrigan. Thank you, Your Honors. Good afternoon, Counsel. I will keep my comments brief and address very succinctly those arguments raised by Defense Counsel just recently, unless, of course, asked to do otherwise by this Court. The initial position of the State, of course, is that the issue of excited utterance was not preserved. The fact that the term was raised by the State does not preserve the issue. It was not the basis for the introduction of the evidence by the defendant. There's no evidence in support of that motion argued by Defense Counsel, nor is anything raised in the post-trial motion that would suggest that there was a discussion of excited utterance. Furthermore, the application simply doesn't apply. The inherent reliabilities that are associated with an excited utterance simply don't exist in this instance. There is nothing about this circumstance that would give unique credibility to the statement made by this defendant when asked to take some action to assist in the care of the victim. The fact that he bludgeoned the man to death may make it something that would ordinarily be considered a crime. But it doesn't cause an individual citizen some remorse or some heightened anxiety. It doesn't raise this to an excited utterance. This gentleman, this defendant, had sufficient time to think of what he just did, think of the circumstances of what he just did, and try to come up with some plausible explanation for it. And quite honestly, it's not there. I don't know a more open and shut case that I've had in 35 years of doing this. This gentleman buried himself. It's his own testimony. I mean, his testimony was completely supported by the physical evidence at the scene, but it's his own testimony that removed his suggestion of self-defense. He admits that this victim never did anything to threaten him. He may have had a knife on his person, but he never made an effort to reach for it. The defendant admits that he was not at all upset or scared or threatened by the knife. The victim did not strike him. The victim did not threaten him. You know, this is simply not a case of self-defense. This gentleman, the defendant, grabbed a 29-inch lead pipe and beat this man to death, striking him over 12 times. He admits that he's done it. He admitted that he did it four or five times. It took an autopsy to reveal that it was more than 12. Nevertheless, you know, his suggestion, even if we accept everything he said at the time of trial, still does not rise to the level of self-defense. The fact that this victim may have been standing prior to the initial blow, the fact that the victim may have said, what are you going to do about me leaving, or that the victim grabbed his belt after being struck the initial time and held on to it for some undetermined amount of time, hard to believe. But even if true, it hardly gives rise to a claim of self-defense. It's hard to imagine the barbaric nature or what it would take for another human being to strike someone that many times. It's one thing to shoot somebody perhaps in a haste of anger or some type of emotional response, but to take a weapon like that and repeatedly brutalize someone, I don't know what could be more heinous or brutal. You know, I know those terms are difficult to define. The court has attempted to do so. They have looked at language, various factors, trying to define exceptionally brutal and heinous. They include unprovoked nature of the attack. This certainly appears to me to be unprovoked. I mean, yes, the gentleman wouldn't leave his residence, but how about calling the police then? How about asking the neighbor for assistance? How about just leaving? You know, to suggest that the conduct of the defendant was in any way justified by the actions of the victim is, I think, beyond pale. I think that the jury had no recourse other than to find the actions of this gentleman extremely brutal and heinous. And the court was appropriate in putting him away for a long period of time in order to protect the rest of us from this type of psychotic behavior. There are no questions from the court. And Mr. Londrigan, did you have some additional briefs you wanted to file with the court today regarding the motion that your office had filed as far as the original brief? I think it was missing a page. You know, I don't know that we filed anything like that or not, Judge, but I will apologize if my office did follow up with that. I don't have it with me this afternoon. But I did note in reading my brief that, I don't know what's going on here. There was a missing page and there was a reference made that you or somebody was going to submit to us today that additional page. There were briefs with the page included and there was a motion filed and that was granted and there was no response. Let me call my office and apply immediately after the argument here today and see what's going on there. I don't actually have an office in the building. I have a satellite office. But I did note in addition to that that there's some kind of page thing going on too. There's sentences repeated and then there's sentences totally deleted. So I don't know. Apparently we have an issue with our software, but I'll try to get that corrected. Okay. All right. Thank you. I don't see any further questions. Thank you. Mr. Kopacz. Thank you, Your Honors. As to the correction of the brief, as far as I recall, the motion referred to an error in scanning. So there was a line or two that had been missing. Was it page five or something? I believe it was a line on page five that was referred to. So we have no objection to the state filing a corrected brief. I can't imagine that it would be any issue of real substance. Thank you. With respect to the excited utterance, I guess the overall point is that the rule looks to determine whether the statement was made during the stress or the excitement immediately following the startling event. And that's what we have here. We have a situation that arises abruptly. We have a 911 emergency call that takes place immediately afterwards. And in the course of trying to get aid, Masterson makes a statement really unprompted about the violent and threatening nature of Jason Tournier. And so this really does get at the heart of what the excited utterance rule is all about. A spontaneous declaration made while the excitement is still occurring, just a couple of minutes after, about two minutes into the 911 call, a couple of minutes after the altercation has taken place. That's what the excited utterance rule is about. So because he was under the stress or excitement, he didn't have time to come up with a plausible explanation as to what happened. So it should be admitted under that theory. As to the issue of self-defense and whether this was self-defense, it's also important to remember that this jury was instructed not only on self-defense, but second-degree murder for imperfect self-defense. So the jury could have found that there was no objectively reasonable basis to resort to self-defense, but that Masterson had a legitimately subjective, or actually subjective belief in the need to use self-defense, though unreasonable. And so that's something that this issue and the second issue could have made a difference with respect to. As to the plain error argument, we would say, you know, the State is the one who objected here to the admission of the 911 call. It's not any different than this ordinary garden variety trial objection, where a witness testifies to something, the opposing party says, objection, not an excited utterance, not a prior consistent statement, and the court would overrule. And it's put in the post-trial motion, and that's sufficiently preserved for review. That's what's happened here. The court had the opportunity to litigate and to rule on these. So we would maintain that this is sufficiently preserved for review. As to the third issue about the sentencing enhancement, I'll grant that the injuries look a little gruesome, and can be disturbing to look at. They're severe injuries. The fact is that this was a death that occurred by a bludgeoning. We've cited cases in the brief where a defendant was struck with a baseball bat, with a car jack, with a bird bat. Presumably these were also severe injuries, but severe enough to bring about the victim's death. Those were injuries that weren't deemed exceptionally brutal or heinous, and indicative of wanton cruelty, such that the defendant merits an extended term sentence. If this Court has no further questions, we'd ask that you reverse the conviction and remand for a new trial, or alternatively, reverse the sentence and remand for a resentencing. Thank you, counsel. We'll be in recess and take this matter under advisement.